WO

SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Mario Alberto Hernandez,

No. CV-23-01400-PHX-SHD (ESW)

Plaintiff,

v.

**ORDER**

Chandler, City of, et al.,

Defendants.

Plaintiff Mario Alberto Hernandez brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 and Arizona law based on events that allegedly took place pertaining to an order of protection Hernandez's then-wife, Mia Ariel Ingram, sought and obtained against him in the Chandler Municipal Court. Pending before the Court are the following Motions: (1) Defendant State of Arizona's Motion to Dismiss Third Amended Complaint (Doc. 100), (2) Hernandez's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 102), (3) Chandler Defendants' Motion to Dismiss Third Amended Complaint (Doc. 103), and (4) Defendant Lemonade Insurance Company's Motion to Dismiss (Doc. 116).[1] Hernandez was informed of his rights and obligations to respond to

---

[1] This Motion is a corrected copy of the Motion at Doc. 113, which the Court directed the Clerk of Court to file under seal because the caption contained the names of minor children that had not been redacted. (*See* Doc. 115.) Per the Court's Order directing Defendant Lemonade to "file a corrected version of the Motion to Dismiss omitting the names of the minor children pursuant to Fed. R. Civ. P. 5.2," Defendant Lemonade refiled the Motion at Doc. 116; however, the prior, sealed version at Doc. 113 still appears on the Court's docket as a pending motion. The Court will direct the Clerk of Court to withdraw

the three Motions to Dismiss (Docs. 105, 106, 122), and all pending Motions are fully briefed. (Docs. 107, 108, 111, 112, 117, 119, 125, 127, 128.) Additionally, pending before the Court are Hernandez's requests for an extension of time to serve certain defendants, (Doc. 138 at 2–4), and his request that the Court appoint a guardian ad litem to protect his minor children's interests or, in the alternative, authorize him to pursue claims "as a next friend," (Doc. 139 at 2–3). The Court will address these requests in this order as well.

**I.    Background**

Hernandez initiated this action in the Maricopa County Superior Court against the City of Chandler, the Chandler Municipal Court, and the Chandler Police Department, and these Defendants properly removed the action to this Court and paid the filing fee. (Doc. 1.) Since removal, Plaintiff has amended his Complaint three times—each time, adding Defendants and claims or restating dismissed claims. (*See* Docs. 18, 31, 99.)

In several prior Orders, the Court dismissed without prejudice Plaintiff's § 1983 claims against Defendants the State of Arizona (the State); the City of Chandler (the City); Chandler Deputy City Prosecutor Rosemary Rosales and Chandler Police Officers Billie Etringham, Heath Hernandez, Joshua Cohen, Sal Haro Trujillo, Jacob Ramer, Joseph Phelps, and Zachary Thomas (the Individual Chandler Defendants); private individual Antoinette Ingram; and the spouses of all individual Defendants, named only as Doe Defendants. (*See* Docs. 17, 30, 61, 96.)

In the latest of these Orders, on April 23, 2025, the Court dismissed without prejudice Hernandez's federal claims against all then-remaining Defendants for failure to state a claim and granted with limitations Hernandez's then-pending Motion for Leave to File Third Amended Complaint. (Doc. 96). On granting leave to amend, the Court specified that "Hernandez may reassert his state law claims in the Third Amended Complaint [and] any new claims identified in the Proposed Third Amended Complaint (Doc 86-1)." (Doc. 96 at 22.) The Court also permitted Hernandez to "reassert any dismissed claims, but only to extent he alleges facts that remedy the defects in pleading

Doc. 113.

identified in the Court's [prior dismissal] orders." (*Id.*) The Court further specified that, "[t]o ensure that Hernandez complies with this limitation, the Court will review all federal claims asserted in a third amended complaint for sufficiency sua sponte," and it stated that Defendants were not required to respond to the federal claims unless ordered to do so. (*Id.* at 20−21.) On May 23, 2025, Plaintiff timely filed a 59-page, 19-count Third Amended Complaint (TAC), which is now the operative complaint. (Doc. 99.)[2]

## II.    Summary Dismissals

### A.    New Defendants and Claims

In the TAC, Plaintiff adds several new Defendants and claims. Plaintiff names the Arizona Department of Economic Security, Lemonade Insurance Company, Sean Duggan and Jane Doe Duggan, Geoffrey Wrescher and Jane Doe Wrescher, Mario Urrutia and Jane Doe Urrutia, Mia Ingram and John Doe Ingram, and Jonelle Harris and John Doe Harris. (Doc. 99 at 4−8.) Plaintiff did not name these entities and individuals in any prior pleadings, identify them as potential Defendants in his Motion for Leave to File Third Amended Complaint (Doc. 86 at 6), or name them in his proposed amended pleading. (Doc. 86-1 at 2−3.)

As noted, the scope of the Court's grant of leave to amend was limited. The Court only permitted Hernandez to assert or reassert his state law claims, his dismissed federal claims, and "any new claims identified in the Proposed Third Amended Complaint (Doc. 86-1)." (Doc. 96 at 22.) Plaintiff's attempt to name new Defendants based on new theories of liability in the TAC exceeds the bounds of this grant and warrants summary dismissal of these additional Defendants and claims. *See Lizza v. Deutsche Bank Nat'l Tr. Co.*, 714 F. App'x 620, 622 (9th Cir. 2017) (the district court properly "struck the Lizza Plaintiffs' Second Amended Complaint for exceeding the scope of amendment permitted in the court's first dismissal order [that] allowed the Lizza Plaintiffs to make more specific

---

[2]    Hernandez purports to bring this action on behalf of himself and his minor children, but he cannot assert claims on behalf of his minor children in his pro se capacity. *See, e.g.*, *Grizzell v. San Elijo Elementary Sch.*, 110 F.4th 1177, 1179 (9th Cir. 2024).

the [] claims they asserted in their First Amended Complaint . . . not to assert a wholly new theory of liability"); *see also Royal Ins. Co. of Am. v. Sw. Marine*, 194 F.3d 1009, 1016–17 (9th Cir. 1999) ("late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action") (quoting *Acri v. International Assoc. of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir.1986)). The Court will summarily dismiss the above-named new Defendants and will deny as moot new Defendant Lemonade Insurance Company's Motion to Dismiss.

The Court will also summarily dismiss the following claims, which Hernandez also did not assert in his prior pleadings or set forth in his Motion for Leave to File Third Amended Complaint or in his draft Third Amended Complaint:

1. Count 4: § 1983 claims against multiple prior and new Defendants based on procedural due process violations (parental rights);

2. Count 5: § 1983 claims against multiple prior and new Defendants based on substantive due process violations (parental rights);

3. Count 7: § 1983 claims against "City of Chandler Officials" under the Fourteenth Amendment based on damage to reputation plus employment loss;

4. Count 8: § 1983 claims against multiple prior and new Defendants based on "conspiracy with state actors to violate constitutional rights";

5. Count 11: state law "false light/invasion of privacy" claims against multiple prior and new Defendants;

6. Count 14: state law "abuse of process claims" against only new Defendants;

7. Count 16: a state law negligent supervision and training claim against the City;

8. Count 17: state law "tortious interference with employment and business relations" claims against multiple prior and new Defendants;

9. Count 18: state law "loss of consortium (children and mother)" claims against multiple prior and new Defendants; and

10. Count 19: state law contract claims against new Defendant Lemonade Insurance

1    Company based on "breach of contract and bad faith insurance denial."

2    **B.    The State**

3    The Court previously dismissed the State without prejudice pursuant to Rule

4    12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction on

5    the ground the State has Eleventh Amendment immunity to suits against it in federal court,

6    which it has not waived. (*See* Doc. 61 at 15−17.) As the Court made clear in that Order,

7    "the Court has no authority to ignore the State's constitutional immunity to suit absent a

8    clear waiver of that immunity or an unambiguous act of Congress, which is not present

9    here." (*Id.* at 17.) For the reasons already set forth in that Order, the Court will grant the

10   State's renewed Motion to Dismiss (Doc. 100) and will summarily dismiss the State and

11   any reasserted claims against it in the TAC for lack of subject matter jurisdiction.

12   **C.    The City**

13   The Court previously dismissed Hernandez's § 1983 claims against the City for

14   failure to state a claim on the ground that Hernandez failed to allege sufficient facts to show

15   he suffered a constitutional violation due to any Individual Chandler Defendant's conduct,

16   and even if he could do so, "he has not alleged [any] facts to support a policy or inadequate

17   training/supervision claim against the City." (Doc. 30 at 10.)

18   In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658

19   (1978), the Supreme Court held that a local government entity "may not be sued under

20   § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when

21   execution of a government's policy or custom, whether made by its lawmakers or by those

22   whose edicts or acts may fairly be said to represent official policy, inflicts the injury that

23   the government as an entity is responsible under § 1983." *Id.* at 694; *see Connick v.*

24   *Thompson*, 563 U.S. 51 (2011) ("local governments are responsible only for their own

25   illegal acts"). A municipality cannot be held vicariously liable under § 1983 for its

26   employees' actions. *Connick*, 563 U.S. at 60. To state a claim for *Monell* liability, a

27   plaintiff must allege a constitutional injury that results from a custom or policy of the

28   municipality or from a failure to train. *Monell*, 436 U.S. at 690−91; *City of Canton v.*

1   *Harris*, 489 U.S. 378, 388 (1989).

2       A plaintiff pursuing *Monell* liability based on a failure to train or supervise must

3   allege that the municipality exhibited "'deliberate indifference to the rights of persons' with

4   whom those employees are likely to come into contact." *Lee v. City of Los Angeles*, 250

5   F.3d 668, 681 (9th Cir. 2001) (citation omitted). "'[D]eliberate indifference' is a stringent

6   standard of fault, requiring proof that a municipal actor disregarded a known or obvious

7   consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S.

8   397, 410 (1997).

9       In the failure-to-train context, deliberate indifference may be shown if "the need for

10  more or different training is so obvious, and the inadequacy so likely to result in the

11  violation of constitutional rights, that the policymakers of the [municipality] can

12  reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio*

13  *v. Harris*, 489 U.S. 378, 390 (1989). "A pattern of similar constitutional violations by

14  untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for

15  purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs*, 520

16  U.S. at 409). "Without notice that a course of training is deficient in a particular respect,

17  decisionmakers can hardly be said to have deliberately chosen a training program that will

18  cause violations of constitutional rights." *Id.* at 62. "A municipality's culpability for a

19  deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at

20  61.

21      In each of his restated § 1983 claims against the City in Counts 1, 2, 3, and 6,

22  Hernandez supports his *Monell* theory of liability with variations of the same conclusory

23  allegation: i.e., "Defendant City of Chandler is liable pursuant to [*Monell*] because the

24  actions of its officers were taken pursuant to an official policy, custom, or practice, or

25  resulted from the City's failure to adequately train, supervise, or discipline its officers."

26  (TAC ¶¶ 143, 157, 171, 221.)  Hernandez does not identify any alleged constitutionally

27  deficient policies of the City or allege any facts from which to infer a pattern or practice of

28  similar constitutional violations.  Instead, he merely provides a "formulaic recitation of the

elements" of a claim, which is inadequate to state a claim.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported. by mere conclusory statements, do not suffice.").

Hernandez's attempt to assert a § 1983 claim against the City in Count 9 based on "failure to supervise, train, or discipline" (TAC at 99) fares no better.  Once again, Hernandez relies almost entirely on conclusory allegations, such as that the City, via its Chief of Police Sean Duggan, "was aware, or should have been aware, of widespread misconduct by subordinate officers involving false arrests, misuse of protective orders, failures to document incidents, and interference with citizen rights"; the City "failed to take reasonable steps to supervise or discipline the officers . . . contributing to the violations alleged herein"; and these alleged failures "were part of a pattern of misconduct."  (*Id.* ¶¶ 249−252.)   Courts applying federal pleading standards in the *Monell* context have routinely found such allegations inadequate to state a claim.  *See, e.g., A.E. ex rel. Hernandez v. City of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) ("[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.  This standard applies to *Monell* claims . . . ." (citations omitted)); *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011) ("Dougherty's *Monell* and supervisory liability claims lack any factual allegations that would separate them from the 'formulaic recitation of a cause of action's elements' deemed insufficient by *Twombly*. . . . The Complaint lacked any factual allegations regarding key elements of the *Monell* claims, or, more specifically, any facts demonstrating that his constitutional deprivation was the result of a custom or practice of the City of Covina or that the custom or practice was the 'moving force' behind his constitutional deprivation.").

Apart from the above conclusory allegations, Hernandez relies on a single instance of alleged misconduct by City employees to show a failure to train or supervise. He alleges Chandler City Councilmember Jane Poston filed a "notice of claim" against the City accusing Chief Dugan and Assistant Chief Dave Ramer of defaming her by "spreading knowingly false rumors of an FBI investigation into her business dealings with the police union." (TAC ¶ 252.)[3] In addition to being vague, this single, undated instance of alleged defamation of a City Councilmember by City officials is insufficient to infer that the City had a pattern or practice of City employees defaming private citizens at the time of this action. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). By the same token, one alleged instance of defamation is insufficient to infer a pattern or practice of similar violations by untrained employees from which to infer the City was both aware of and deliberately indifferent to a need for more or better training in this area. *Connick*, 563 U.S. at 62.

Additionally, this alleged instance does not help Hernandez because, even if the allegation was sufficient to infer the City fails to adequately train its employees to not engage in defamation, Hernandez does not allege any facts from which to infer that a failure to train in this area caused City employees to engage in any similar violations underlying his claims against the City in this action. Although he asserts a state law defamation claim in Count 10, Hernandez only alleges that private individuals, including Defendant Antoinette Ingram, made false and defamatory statements against him, not that he was defamed by any City employees or that any such violations occurred under similar circumstances to those allegedly presented in the Councilmember's notice of claim. Lacking any discernable connection to any alleged misconduct toward Hernandez, this

---

[3] While not entirely clear, it appears from the allegations in Count 9 that the alleged defamation either occurred or became known to the City on November 8, 2023, which, in addition to having little apparent similarity to the facts alleged in Hernandez's case, post-dates the events underlying the claims in this action. (*See* TAC ¶ 253.)

added allegation of defamation by City officials provides no plausible support for Hernandez's *Monell* claims against the City based on failure to train and supervise. Hernandez also does not allege any nonconclusory facts to show the City was both aware of, and deliberately indifferent to, a need for more or better training of its employees on "false arrests, misuse of protective orders, failures to document incidents, and interference with citizen rights."

Because Hernandez fails to allege any facts from which to hold the City liable based on a policy, pattern or practice, or failure to train under *Monell*, the Court will summarily dismiss Hernandez's §1983 claims against the City.

### D.    Remaining Claims

After the above dismissals, the following claims remain:

1. Count 1: a Fourth Amendment unlawful search and seizure claim against Defendant Officer Ramer;[4]

2. Count 2: Fourth Amendment false arrest and malicious prosecution claims against Defendant Officers Ramer and Thomas;

3. Count 3: First Amendment retaliation claims against Individual City Defendants Officer Cohen and Prosecutor Rosales;

4. Count 6: Fourteenth Amendment failure to intervene claims against several Individual Chandler Defendants;

5. Count 10: a state law defamation claim against Defendant Antoinette Ingram;

6. Count 12: state law intentional infliction of emotional distress (IIED) claims against "all Defendants"; and

7. Count 15: a state law civil conspiracy claim against Defendant Antoinette Ingram;

---

[4]    Plaintiff purportedly brings this and other similar claims under both the Fourth and Fourteenth Amendments. (Doc. 99 at 17, 19.) The Court previously dismissed any intended separate Fourteenth Amendment claims based on alleged unlawful search and seizure on the ground that such claims arise, if at all, under the Fourth Amendment, and "Hernandez fails to allege any facts that would state a separate due process claim." (Doc. 96 at 9.) Plaintiff appears to have ignored or overlooked this part of the Court's Order.

1    **III.    Rule 12(b)(6) Legal Standard**

2          Dismissal of a complaint, or any claim within it, for failure to state a claim under

3    Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable

4    legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"

5    *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting

6    *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).   In determining

7    whether a complaint states a claim under this standard, the allegations in the complaint are

8    taken as true and the pleadings are construed in the light most favorable to the nonmovant.

9    *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).   A

10   pleading must contain "a short and plain statement of the claim showing that the pleader is

11   entitled to relief."   Fed. R. Civ. P. 8(a)(2).   But "[s]pecific facts are not necessary; the

12   statement need only give the defendant fair notice of what . . . the claim is and the grounds

13   upon which it rests."   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation

14   omitted).   To survive a motion to dismiss, a complaint must state a claim that is "plausible

15   on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v.*

16   *Twombly*, 550 U.S. 544, 570 (2007).   "A claim has facial plausibility when the plaintiff

17   pleads factual content that allows the court to draw the reasonable inference that the

18   defendant is liable for the misconduct alleged."   *Iqbal*, 556 U.S. at 678.

19         As a general rule, when deciding a Rule 12(b)(6) motion, courts look only to the

20   face of the complaint and documents attached thereto.   *Van Buskirk v. Cable News*

21   *Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner*

22   *& Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).   If a court considers evidence outside

23   the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary

24   judgment.   *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003).   A court may,

25   however, consider documents attached to the complaint or incorporated by reference in the

26   complaint or matters of judicial notice without converting the motion to dismiss into a

27   motion for summary judgment.   *Id.*

28

1    **IV.    Hernandez's Allegations in the TAC**

2             On or about June 30, 2022, Hernandez's now ex-wife, Mia Ingram, obtained an ex

3    parte Order of Protection ("OP") against Hernandez.[5]  (Doc. 99 ¶ 67.)  Hernandez did not

4    receive prior notice or an opportunity to respond.  (*Id.* ¶ 68.)  Following the issuance of the

5    OP, and under the authority of the City, Chandler Police Officers removed Hernandez from

6    his Chandler residence ("the Residence") at 701 N. McQueen Rd., Unit 19.  (*Id.* ¶ 69.)

7             On July 11, 2022, the Chandler Municipal Court conducted a hearing on the OP,

8    which it held telephonically due to COVID-19 restrictions, and Mia Ingram appeared with

9    her mother, Defendant Antoinette Ingram, and a former neighbor.  (*Id.* ¶¶ 70, 73.)  The

10   remote nature of the hearing "limited Hernandez's ability to present evidence and cross-

11   examine witnesses in person."  (*Id.* ¶ 73.)  Following the hearing, the court upheld the OP;

12   Hernandez was required to vacate the family residence immediately; and Mia Ingram was

13   given temporary full custody of the couple's minor children, L.H. and O.H.  (*Id.* ¶ 72.)

14            Between July 11, 2022 and September 2022, Chandler Police contacted Hernandez

15   multiple times regarding the OP, and despite Hernandez's full compliance and the absence

16   of any new information or reported incidents, officers continued to call and question

17   Hernandez about possible violations.  (*Id.* ¶¶ 74−76.)  Around August 18, 2022, the

18   property management company for the Residence, CALCAP, contacted both Hernandez

19   and Mia Ingram regarding the rent.  (*Id.* ¶ 77.)  In response, Mia Ingram emailed CALCAP

20   saying she no longer resided at the Residence and it belonged to Hernandez.  (*Id.* ¶ 78.)

21            In an email dated August 18, 2022, Mia Ingram emailed the City saying she no

22   longer resided at the Residence.  (*Id.* ¶ 95.)

23            On or about September 3, 2022, neighbors of the Residence contacted 9-1-1 to

24   report a disturbance involving Mia Ingram's mother, Defendant Antoinette Ingram.  (*Id.*

25   ¶ 79.)  The neighbors reported they saw Defendant Ingram loading a Penske moving truck

26   _____

27   [5]       Plaintiff calls the OP "phony," but this allegation is vague and conclusory and is, at

28   bottom, a mere legal conclusion, which is not entitled to a presumption of truth.  *Pareto v.*
     *FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

with Hernandez's personal belongings.  (*Id.* ¶ 79.)  Chandler Police officers were dispatched to the scene, and they observed Defendant Ingram's removal of property but did not intervene, write a formal report, or initiate any investigation or protective measures, and no one contacted Hernandez regarding the removal of his property.  (*Id.* ¶¶ 80−83.)

On or about September 10, 2022, Hernandez moved back into the Residence with the permission of the management company.  (*Id.* ¶ 83.)  While Hernandez was inside the Residence, Chandler Police, acting on a report from Mia Ingram, entered the garage without a warrant and called Hernandez to inform him they were outside.  (*Id.* ¶¶ 83−84.)[6] Police arrested Hernandez with machine guns pointed at his head for allegedly violating the OP, and Hernandez peacefully surrendered.  (*Id.* ¶¶ 85−87.)  Following his arrest, the property management company transferred Hernandez from Unit 19 to Unit 10 in the same complex due to the OP and related events, and the lease for Unit 19 was discontinued.  (*Id.* ¶¶ 90, 91.)  Afterwards, Hernandez continued living in Unit 10 without a formal lease.  (*Id.* ¶¶ 91, 92.)

On September 17, 2022, Hernandez filed a theft report with the Chandler Police, documenting the loss of personal property from the Residence on or about September 3, 2022.  (*Id.* ¶ 88.)  Hernandez also made a $50,000 claim with Lemonade Insurance Company regarding the stolen property, and on February 7, 2023, the claim was denied. (*Id.* ¶ 89.)  On September 18, 2023, Hernandez executed a written settlement agreement with the property management company "regarding his occupancy, and the transgressions that occurred."  (*Id.* ¶ 93.)

---

[6]    Similar to his allegations that Mia Ingram obtained a "phony" OP, Plaintiff vaguely alleges Mia Ingram gave a "false report" to Chandler Police, but he does not allege what she told police or what about her statements were false.  (Doc. 99 ¶ 84.)  Absent any underlying facts, Plaintiff's allegations of falsehood are merely conclusory and not entitled to a presumption of truth.  Plaintiff also provides a numbered footnote, unattached to any allegations in the body of the TAC, about a "swatting incident" involving Chandler Police that resulted in Plaintiff's criminal prosecution, but the facts in the footnote are likewise vague and conclusory, and it is not clear whether or how they relate to the alleged "false report" from Mia Ingram on September 10, 2022.  (*See id.* at 10 n.18.)

At some point after Hernandez's arrest, City prosecutors pursued criminal charges against Hernandez for violating the OP, even though before Hernandez's arrest, the City received Mia Ingram's August 18, 2022 email, stating she no longer lived at the Residence. (*Id.* ¶¶ 94−96.) On or about November 11, 2022, at a pretrial conference, prosecutor Mario Urrutia told Hernandez he could face incarceration if he did not plead guilty. (*Id.* ¶ 97.) Hernandez declined to plead guilty and requested counsel, which the court appointed for him. (*Id.* ¶¶ 98, 99.) After the hearing, Hernandez encountered his son outside and told him he loved him. (*Id.* ¶ 100.) Shortly afterwards, Chandler Police referred new charges against Hernandez, alleging that speaking to his son violated the OP. (*Id.* ¶ 101.)

At some point during his criminal proceedings, Hernandez became concerned that his appointed counsel did not investigate the facts of his case, challenge the OP, or acknowledge that the OP "had already been appealed," so Hernandez terminated the representation, and the court appointed new counsel. (*Id.* ¶¶ 103−105.) Hernandez's second appointed attorney reviewed the case file and determined that the appellate court had remanded the case and ordered a new hearing on the OP. (*Id.* ¶ 106.)

In January 2023, Hernandez filed for divorce from Mia Ingram and requested a stay of divorce proceedings because his mother, Melila Schuch, who was expected to testify on his behalf, was seriously ill. (*Id.* ¶ 112.) The family court denied the stay. (*Id.* ¶ 113.)

On February 17, 2023, the Chandler Municipal Court held a new hearing on the OP at which Hernandez represented himself. (*Id.* ¶ 109.) Mia Ingram did not appear, so the court dismissed/vacated the OP. (*Id.* ¶ 111.) Despite this dismissal, during divorce proceedings in March 2023, Mia Ingram filed a second OP, relying on the same or similar allegations that had already been discredited, but this OP did not include the minor children. (*Id.* ¶¶ 114−16.) That same month, Hernandez's new attorney in his criminal case informed Hernandez that the Chandler Municipal Court dismissed the charges against him for violating the OP based on the August 18, 2022 email Mia Ingram sent to the City stating she no longer lived at the Residence. (*Id.* ¶¶ 117, 118.)

On July 19, 2023, Hernandez received an email from Defendant Deputy City

Attorney Rosemary Rosales during discussions of a potential "settlement" with the City Attorney's Office. (*Id.* ¶¶ 119, 120.)[7] The email referenced possibly hiring an investigator to look into Hernandez's background, but shortly after sending the message, Rosales "attempted to recall it." (*Id.* ¶ 120.)

On October 6, 2023, the family court held a divorce trial without complete discovery and without Hernandez or his key witness, his mother Melilah Schuch, present. (*Id.* ¶ 121.) The court entered a dissolution of marriage decree, relying in part on the June 30, 2022 OP, even though that OP had already been vacated earlier in 2023. (*Id.* ¶ 122.) Hernandez timely appealed the decree, and the Arizona Court of Appeals upheld the family court's ruling, even though the court acknowledged discovery had not been completed. (*Id.* ¶ 124.)

On December 3, 2024, Hernandez's mother passed away "during the pendency of litigation," while Hernandez "was experiencing ongoing legal and personal stress." (*Id.* ¶¶ 125, 126.)

On March 3, 2025, the Arizona Supreme Court denied Hernandez's Petition for Review in case number CV-24-0235-PR. (*Id.* ¶ 127.)[8] Shortly after this, on March 24, 2025, Hernandez was denied employment with New York Life based on a background check that revealed his arrest for violating the June 30, 2022 OP, even though that OP had been dismissed and vacated. (*Id.* ¶ 128.)

As a result of the above events, Hernandez and his minor children experienced "significant reputational harm, loss of familial association, diminished employment opportunities, and emotional hardship." (*Id.* ¶ 129.)

---

[7]    As in the SAC, it is not clear from Hernandez's allegations in the TAC what the parties were attempting to settle.

[8]    Hernandez alleges only the case number assigned to his Petition before the Arizona Supreme Court and not any facts from which to identify the underlying legal action— whether the OP or divorce proceedings—for which he sought appellate review.

1    **V.    Sua Sponte Review of § 1983 Claims**

2        **A.    Count One: Unlawful Search**

3        Hernandez's Fourth Amendment unlawful search claim against Defendant Ramer

4    in Count One is based on Defendant Ramer's alleged warrantless entry into Hernandez's

5    garage on September 10, 2022, when he, along with other officers, went to the Residence

6    and arrested Hernandez for violating the OP.  (TAC ¶¶ 135−136.)  This claim mirrors

7    similar claims in Count Three of the SAC.  (*See* Doc. 31 ¶ 141.)

8        The Fourth Amendment protects the "right of people to be secure in their persons,

9    houses, papers, and effects, against unreasonable searches and seizures" absent a warrant

10    supported by probable cause.  U.S. Const. amend. IV.  "An entry into a residence that is

11    not under a warrant, that lacks consent, and that is not justified by exigent circumstances

12    or an emergency is unreasonable."  *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1075

13    (9th Cir. 2018).  Fourth Amendment protections extend to the curtilage of a house, which

14    is the area around the house that the occupant may "reasonably expect" should be treated

15    "as the home itself."  *United States v. Dunn*, 480 U.S. 294, 300 (1987).  A warrantless entry

16    and search of a premises is permitted under the Fourth Amendment "when police obtain

17    the voluntary consent of an occupant who shares, or is reasonably believed to share,

18    authority over the area in common with a co-occupant who later objects to the use of

19    evidence so obtained."  *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

20        The Court previously dismissed Hernandez's Fourth Amendment unlawful search

21    claim because it found the allegations in the SAC were too vague and conclusory to state

22    a claim against any named Defendant.  (Doc. 96 at 10.)  The only allegation that could

23    potentially give rise to such a claim in the SAC was that Defendant Ramer left a voicemail

24    on Hernandez's phone saying he knew Hernandez was in the residence because "*they*

25    questioned [Hernandez's] neighbor maintenance man, entered the certain curtilage around

26    [Hernandez's] garage, opened the garage door to find [Hernandez's] car inside . . . and

27    initially tried to open the interior door to [Hernandez's] home." (Doc. 31 ¶ 141 (emphasis

28    added).)  The Court found these allegations insufficient to state a clam because Hernandez

did not allege "that any named Defendants . . . were even on the scene or participated in the alleged unlawful search of the property to show they were personally involved in any alleged violations."  (*Id.*, quoting *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights").)

In the TAC, Hernandez relevantly alleges that, on or about September 10, 2022, Defendant Ramer and other officers "entered Hernandez's private garage without a warrant, without consent, and in the absence of exigent circumstances."  (Doc. 99 ¶ 136.) He also alleges the officers were "responding to a report from Mia Ingram, who had previously disavowed residence at the property."  (*Id.* ¶ 138.)  This time, Hernandez names Defendant Ramer as one of the officers who allegedly entered the garage and did so "without a warrant, without consent, and absent exigent circumstances."  (*Id.* ¶ 136.)  These allegations are sufficient to cure the deficiencies the Court identified in its prior Order wherein it dismissed this claim because the allegations were too vague to identify the alleged actions of any named Defendant.  (*See* Doc. 96 at 11.)

Hernandez nonetheless fails to state a Fourth Amendment claim because he fails to allege any facts showing he has personal knowledge of what Mia Ingram said to police when she reported Hernandez's suspected unlawful presence at the Residence from which to plausibly infer the search was without her consent.  The Court previously took judicial notice of the OP, which states that Mia Ingram was granted "exclusive use and possession of the residence" and prohibits Hernandez from being at or near the Residence.  (*See* Doc. 96 at 12−13.)  The Court likewise relied on the police report of Hernandez's arrest, which Hernandez attached to the SAC, which shows Mia Ingram called the Chandler Police Department to report Hernandez was inside the Residence in violation of the OP, and dispatch confirmed the OP was still in effect.  (*Id.* at 12; Doc. 31-2 at 5.)  *See Ritchie*, 342 F.3d at 907–08 (courts may consider "certain materials—documents attached to the

complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment"). The fact that Mia Ingram no longer lived at the Residence did not nullify the terms of the OP, giving her exclusive right to be there, and absent any non-conclusory allegations that she did not consent to the search, Hernandez fails to state a claim that the search was unlawful.

Hernandez's Fourth Amendment claim additionally fails because, to show a Fourth Amendment violation based on unlawful search, one must first have "a 'legitimate expectation of privacy in the premises' searched." *Byrd v. United States*, 584 U.S. 395, 403 (2018) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). In *Rakas*, the Supreme Court clarified that this prong is not met simply because someone has a subjective expectation of privacy in a place—such as a burglar entering a summer cabin during the off season—if his presence there is "wrongful," reasoning that one's expectation of privacy in such instances is not one "that society is prepared to recognize as 'reasonable.'" 439 U.S. 128, 143, n.12 (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). The Ninth Circuit has applied this same reasoning to someone entering a habitual residence in violation of a court order, stating,

> Like a burglar, trespasser, or squatter, an individual violating a court no-contact order is on property that the law prevents him from entering. We therefore hold that such an individual lacks a legitimate expectation of privacy in that place and may not challenge its search on Fourth Amendment grounds. In doing so, we join not only the Third Circuit, but every other court that has considered the matter.

*United States v. Schram*, 901 F.3d 1042, 1046 (9th Cir. 2018) (citing, e.g., *United States v. Cortez-Dutrieville*, 743 F.3d 881, 884–85 (3rd Cir. 2014)).

Consequently, even if Plaintiff can allege sufficient facts to show Defendant Ramer's alleged entry into the Residence garage was unreasonable, he does not have standing to assert a Fourth Amendment violation, and the Court will dismiss his Fourth Amendment unreasonable search claim against Defendant Ramer in Count One.

**B.    Count Two: False Arrest and Malicious Prosecution**

Hernandez's Fourth Amendment false arrest and malicious prosecution claims in Count Two are based on Defendants Ramer's and Thomas's alleged arrest of Hernandez at the Residence on charges of violating the OP and on City Prosecutor Mario Urrutia's "continued prosecution against Hernandez, including threatening incarceration if Hernandez did not plead guilty." (TAC ¶¶ 150−152.) The claims against Defendants Ramer and Thomas mirror similar claims against unidentified "Defendant Officers" in Count Three of the SAC. (*See* SAC ¶ 207.)[9]

The Court previously dismissed Hernandez's Fourth Amendment false arrest and/or malicious prosecution claims because it found Hernandez's allegations were too vague and conclusory to state a claim against any named Defendant and that Hernandez's "blanket allegation that 'Defendants' lacked probable cause to arrest, charge, or detain him is a legal conclusion unsupported by the facts alleged." (Doc. 96 at 11.) The Court also found that Hernandez failed to state a claim because "the allegations in the SAC, information contained in documents attached to or referenced in the SAC, and court records of which this Court takes judicial notice, collectively establish that the arrest and prosecution for violating a court order were supported by probable cause" (*Id.*) *See Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994) ("probable cause is an absolute defense to a claim of false arrest and imprisonment"); *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054 (9th Cir. 2009) ("In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause" (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995))). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner v. City & County of San Francisco*, 266 F.3d 959, 966 (9th Cir. 2001) (citation omitted).

---

[9]    As previously discussed, Plaintiff's new claim against Prosecutor Urrutia exceeds the scope of the Court's leave to amend, so the Court will summarily dismiss this claim.

Hernandez has not cured these noted deficiencies in the SAC. This time, he more specifically alleges that Defendants Thomas and Ramer arrested him at the Residence on September 10, 2022, and he alleges they did so "based on an allegedly violated, phony protective order, despite clear evidence that the reporting party, Mia Ingram, no longer resided at the property and had disavowed any right to enforce such an order in an August 18, 2022 email." (TAC ¶ 150.) Although Hernandez now sufficiently identifies Defendants Thomas and Ramer as the officers who arrested him, his allegations do not support that they lacked probable cause to believe he was committing a crime by returning to the Residence in violation of the OP.

Under Arizona Revised Statutes § 13-2810(A), "[a] person commits interfering with judicial proceedings if such person knowingly . . . [d]isobeys or resists the lawful order, process or other mandate of a court." Ariz. Rev. Stat. § 12-2818(A)(2). Based on the facts alleged in the TAC, the Chandler Municipal Court issued the OP without a hearing on June 30, 2022 and subsequently upheld the OP following a telephonic hearing on July 11, 2022. (TAC ¶¶ 67, 72.) As noted, the OP gave Mia Ingram exclusive use and possession of the Residence and prohibited Hernandez from being there. Hernandez also alleges in the TAC that he was inside the Residence at the time of his arrest. (TAC ¶¶ 83−85, 150.) Taken together, these facts are sufficient for a prudent officer in Defendants Thomas and Ramer's positions to have believed Hernandez was violating the OP at the time and was therefore committing a crime under § 13-2810(A).

Hernandez's bare allegation that the OP was "phony" does not compel a different conclusion. The allegation is vague and, in any event, is an unsupported legal conclusion that does not comport with the factual allegations showing the Chandler Municipal Court issued the OP on June 30, 2022, upheld it following a hearing on July 10, 2022, and did not vacate it until February 17, 2023. (*Id.* ¶¶ 67, 72, 109–111.) Hernandez's apparent belief that the court acted improperly when it issued and/or upheld the OP does not change the fact that the OP was issued by a court of law and was therefore a legally binding order at the time of his arrest. Hernandez does not allege any nonconclusory facts showing

otherwise.  Instead, he alleges only that he was arrested "despite clear evidence that the reporting party, Mia Ingram, no longer resided at the property," and she sent an email to the City, wherein she "disavowed residency at the property." (*Id.* ¶¶ 95, 150.)  These facts, however, do not change the probable cause determination.  First, probable cause must be evaluated from the perspective of the arresting officer, and Hernandez has not alleged any facts from which to infer Defendants Thomas and Ramer were aware of Mia Ingram's email to the City saying she no longer resided at the Residence.

More fundamentally, even if known to the officers at the time, the fact that Mia Ingram no longer resided at the Residence does not make Hernandez's presence there during his arrest lawful.  Simply put, the OP prohibited Hernandez from being at or near the Residence and did not make this restriction contingent upon Mia Ingram continuing to reside at the property.  (*See* Doc. 96 at 12−13.)  Thus, despite Mia Ingram moving out, and the property management company telling Hernandez he could move back in, being at the Residence while the OP was in effect violated a court order, and based on their knowledge of the OP and Hernandez's presence at the Residence, Defendants Ramer and Thomas had probable cause to believe Hernandez was committing a crime.  *See United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir. 1975) (to determine probable cause, courts "must consider all the facts known to the officers and consider all the reasonable inferences that could be drawn by them before the arrest").

Hernandez's allegation that the charges against him for violating the OP were later dropped also does not change alter the probable cause analysis because the decision whether to pursue criminal charges may be based on numerous discretionary factors unrelated to probable cause, such that "dismissal [is] not probative of whether the arresting officers acted with probable cause." *De Anda v. City of Long Beach*, 7 F.3d 1418, 1422 (9th Cir. 1993).  Even ultimate vindication on a charge does not defeat a showing of probable cause. *See Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966) ("[W]here probable cause []exist[s,] civil rights are not violated by an arrest even though innocence may subsequently be established.").

Because probable cause is a complete defense to false arrest and malicious prosecution, the Court will dismiss these claims against Defendants Ramer and Thomas in Count Two for failure to state a claim.

### C.    Count 3: Retaliation for Protected Speech

In Count 3, Hernandez brings a First Amendment retaliation claim against Defendant Officer Cohen for allegedly retaliating against him for peacefully, and without any physical contact, telling his son "I love you" following a court proceeding on or about November 11, 2022.  (TAC ¶ 163.)  Hernandez alleges that Defendant Cohen retaliated against him by referring him for criminal prosecution for an alleged violation "of the phony protective order." (*Id.*)

Even though Hernandez did not previously assert a First Amendment retaliation claim against Defendant Cohen, the addition of this claim in the TAC does not exceed the Court's grant of leave to amend because Hernandez set forth his intention to include this claim in his draft Third Amended Complaint.  (*See* Doc. 86-1 at 4.)  Nevertheless, the Court will sua sponte dismiss the retaliation claim against Cohen because Hernandez fails to state a claim upon which relief can be granted.  The Supreme Court has explained that a plaintiff asserting a claim against an investigating agency for retaliatory prosecution must allege, and establish the absence of, probable cause:

> [T]he complexity of causation in a claim that prosecution was induced by an official bent on retaliation should be addressed specifically in defining the elements of the tort.  Probable cause or its absence will be at least an evidentiary issue in practically all such cases.  Because showing an absence of probable cause will have high probative force, and can be made mandatory with little or no added cost, it makes sense to require such a showing as an element of a plaintiff's case, and we hold that it must be pleaded and proven.

*Hartman v. Moore*, 547 U.S. 250, 265–66 (2006).  Here, Hernandez has not alleged, and could not establish, the absence of probable cause because the OP (a) identifies his children as "Protected Persons" and (b) states that he "shall have no contact with **Protected Persons** except through attorneys, legal process and/or court hearings."  (June 30, 2022 Order of Protection at 1.)  While Hernandez disagrees with the entry of the OP, he acknowledges

that it was in effect when he contacted his son "following a court proceeding." (TAC ¶¶ 67, 109–111, 163.)  Based on his own allegations and the language of the OP, it is readily apparent that Cohen had probable cause to recommend criminal charges against Hernandez for violation of the OP, and this claim therefore must be dismissed.

In this same count, Hernandez alleges that Defendant City Prosecutor Rosales retaliated against him by suggesting in an email, which she inadvertently sent to Hernandez, "that the City may consider using an investigator to 'look into' [Hernandez] during active litigation." (*Id.* ¶ 163.)  By this, Hernandez effectively attempts to reconstruct his Negligent Infliction of Emotional Distress (HIED) claim against Defendant Rosales in Count 7 of the SAC, wherein he alleged Rosales "inadvertently mention[ed]" during unspecified "settlement talks" between Hernandez and the City that "they may consider hiring an investigator to look into Hernandez's background." (Doc. 31 ¶ 317.)  The Court previously dismissed this claim because the allegations were too vague and conclusory to meet federal pleading standards, finding that "Hernandez does not allege any other facts about this incident from which to infer that this suggestion violated his federal or constitutional rights." (Doc. 96 at 18.)  The Court also dismissed the claim on the ground it was not clear what role Rosales played in the settlement discussions from which to infer she was acting under color of state law.  (*Id.*)

Hernandez now alleges Defendant Rosales suggested investigating him in an email she inadvertently sent to him, and she allegedly did so in retaliation against him for engaging in protected activity.  (TAC ¶ 167)  He also alleges that his protected activities "includ[ed] filing internal complaints, asserting his innocence in criminal proceedings, submitting government claims, and initiating [unspecified] legal actions to challenge the conduct of local officials."  (TAC ¶¶ 165, 167.)  Hernandez fails to allege any facts connecting these alleged protected activities to Defendant Rosales' email, and his allegations are once again too vague and conclusory for the Court to infer either that the email constituted state action, the "suggestion" to investigate Hernandez was in retaliation for any protected conduct, or that this "suggestion" did not serve a legitimate law

enforcement purpose.  *Cf. Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005) (to state a retaliation claim in the prison context, a plaintiff must allege facts showing the alleged retaliatory action "did not reasonably advance a legitimate correctional goal").  Whether stated as a NIED claim or a First Amendment retaliation claim, Hernandez has not resolved any of the pleading deficiencies of his prior attempt to state a claim against Defendant Rosales, and the Court will dismiss Defendant Rosales from Count 3.

### D.    Count 6: Failure to Intervene

In Count 6, Hernandez asserts a Fourteenth Amendment due process claim against Individual Chandler Defendants Officers Etringham, Phelps, Trujillo, and Hernandez. (TAC at 28.)  These claims are based on Defendant Antoinette Ingram's alleged unlawful removal of property from the Residence in the presence of these Defendants and their alleged failures to write a report, file charges, or take any other action to investigate the alleged theft of Hernandez's belongings.  (*Id.* ¶¶ 207−219.)  The Court addressed and dismissed these same claims in the SAC, finding that Hernandez's allegations of a "robbery" at that time were too vague about what occurred to satisfy threshold pleading standards for stating a claim.  (Doc. 96 at 16.)

More substantively, the Court stated, "even if it is plausible to infer on the facts alleged that Defendant Ingram stole a truckload of items from Hernandez's residence in the presence of Defendant Officers, and the officers did nothing to intervene . . . these facts fail to state a Fourteenth Amendment due process claim."  (*Id.*)  The Court explained:

> The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  This provision "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."); *see also Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) ("Because the City of Seattle had no constitutional duty to protect the Pioneer Square Hernandezes against violence from members of the riotous crowd, 'its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause'" (quoting

*DeShaney*, 489 U.S. at 195)).  Similarly, the Due Process Clause does not confer a right to a thorough investigation of third-party harm.  *Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985) ("[W]e can find no instance where the courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved.").

(*Id.*)

Hernandez's attempt to restate his claims by adding additional facts to clarify what allegedly occurred fails to remedy this fundamental legal insufficiency of his intended claims.  The Court will dismiss Hernandez's Fourteenth Amendment due process claims in Count 6 for failure to state a claim.

**VI    State Law Claims**

**A.    Count 10: Defamation**

To state a claim for defamation under Arizona law, a plaintiff must alleged facts showing (1) the defendant published a false and defamatory statement, and (2) the defendant either (a) knew the statement to be false and defamatory, (b) acted in reckless disregard to these matters, or (c) acted negligently in failing to ascertain them.  *Peagler v. Phoenix Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977).

Plaintiff identifies as Defendants in Count 10 Antoinette Ingram, Mia Ingram, Jonelle Harris, and "John/Jane Does," the latter of whom he names only as the spouses of these Defendants.  (TAC at 39.)  The Court already found that attempting to add Mia Ingram and Jonelle Harris as new Defendants, where Plaintiff did not seek to do so in his Motion to Amend, exceeds the Court's narrow grant of leave to amend.  Accordingly, the only claim within the scope of the Court's leave to amend in Count 10 is Plaintiff's defamation claim against Defendant Antoinette Ingram.

Plaintiff alleges that "Defendants," as a group, made "multiple false and defamatory statements" about him; the statements were made "to law enforcement, courts, housing providers, and others for the purpose of causing [him] legal, reputational, and familial harm"; and the statements were "factually false and made with actual malice or reckless disregard for the truth."  (*Id.* ¶¶ 265−66.)

- 24 -

As an initial matter, Plaintiff does not allege any facts showing that "Defendants" *published* any allegedly false and defamatory statements.  Instead, he alleges only that the statements were made "in court filings, sworn declarations, police reports, emails, and verbal testimony."  (*Id.* ¶ 269.)  But even setting aside whether these contexts qualify as "publishing" a false statement, Hernandez's allegations are, once again, merely conclusory and fail to satisfy threshold pleading standards.

In bringing this claim against Defendant Antoinette Ingram, Hernandez effectively attempts to reassert his § 1983 defamation claim against her in Count 6 of the SAC, which the Court dismissed for failure to state a claim, primarily on the ground that Ms. Ingram is not a state actor who can be sued under § 1983.  (*See* Doc. 96 at 19.)  Additionally, as applicable here, the Court found that Hernandez's allegations were too conclusory to state a claim, explaining that Hernandez "only generally alleges that false statements were made against him at various court hearings . . . he does not identify what was said that was allegedly false or attribute any specific statements to Defendant Ingram."  (Doc. 96 at 19.) Although now stated as a state law claim, which does not require naming a state actor, Plaintiff fails to cure these fundamental pleading deficiencies.  Most glaringly, Plaintiff does not identify any statements made by any Defendants, including Defendant Antoinette Ingram, that were allegedly false and defamatory and therefore fails to put Ingram on notice of the bases of his defamation claim against her.  Although Defendant Ingram did not move to dismiss this claim, the deficiencies are obvious, so the Court will sua sponte dismiss this claim in Count 10.  *See Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990) ("Because it is patently obvious that Baker could not have prevailed on the facts alleged in his complaint, we find that sua sponte dismissal was appropriate.").

### B.    Count 12: IIED

Hernandez's purported IIED claim against "all Defendants" in Count 12 suffers from the same pleading deficiencies.  Hernandez merely alleges in conclusory fashion that all Defendants "engaged in a prolonged course of conduct designed to humiliate, discredit, and emotionally destabilize Plaintiff."  (TAC ¶ 290.)  He then summarily lists the same

alleged violations from other counts that the Court has found fail to state a claim—such as that Defendants "caus[ed] his arrest without probable cause"—or he adds new conclusory allegations—such as that Defendants "fabricat[ed] allegations of abuse to obtain a protective order," blocked him from recovering stolen property, refused to "correct known errors," continued to prosecute him despite exculpatory evidence, and caused the death of his mother, Melilah Schuch.  Because these allegations are merely conclusory, the Court will dismiss Hernandez's IIED claim in Count 12.[10]

### C.    Count 13: Malicious Prosecution

In Count 13, Hernandez asserts a state law malicious prosecution claim against the City based on vicarious liability for its employees' alleged malicious prosecution of Hernandez on charges of violating the OP.  For the reasons already addressed regarding Plaintiff's § 1983 claim for false arrest, this claim fails because the facts before the Court show that Plaintiff's arrest and prosecution were supported by probable cause, which is a complete defense to false prosecution under Arizona law.  *See Slade v. City of Phoenix*, 301, 541 P.2d 550, 553 (Ariz. 1975) (probable cause "constitutes a complete and absolute defense to an action for malicious prosecution"); *Hockett v. City of Tucson*, 678 P.2d 502, 505 (Ariz. Ct. App. 1983) ("The law is well settled that the existence of probable cause is a complete defense to claims of false imprisonment and malicious prosecution"); *Cullison v. City of Peoria*, 584 P.2d 1156, 1160 (Ariz. 1978) ("the existence of probable cause to institute an action is a complete defense to malicious prosecution without regard to the existence of malice").

---

[10]    In their Motion to Dismiss Third Amended Complaint, the Chandler Defendants argue as an additional ground for dismissing any state law claims against the Individual Chandler Defendants that Hernandez failed to comply with Arizona's Notice of Claim statute before filing his claims.  (Doc. 103 at 14−17.)  Because the Court will dismiss these claims and Defendants for failure to state a claim, it need not address this alternate ground for dismissal.

### D.    Count 15: Civil Conspiracy

In Count 15, Hernandez asserts a civil conspiracy claim against Defendant Antoinette Ingram and others based on their alleged "agreement, either expressly or tacitly, to initiate and support legal proceedings against Plaintiff Mario Hernandez based on knowingly false allegations, with the intent to cause him personal, legal, and financial harm."   (TAC ¶ 315.)[11]   Hernandez's only allegations of a conspiracy are wholly conclusory.   Although Hernandez alleges that each named and unnamed Defendant "committed overt acts in furtherance of the conspiracy, including testifying falsely or misleadingly, submitting false documents, making unlawful arrests, suppressing exculpatory evidence, or discouraging Plaintiff from asserting his legal rights," he does not identify any specific acts of any Defendant, including Defendant Antoinette Ingram, to support either that anyone engaged in the alleged conduct or did so as part of a coordinated effort to harm Hernandez.   Like his other asserted state law claims, his conspiracy claim against Defendant Antoinette Ingram is based on nothing more than the formulaic recitation of the elements of claim, which does not suffice to meet basic pleading standards. *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.   The Court will dismiss this claim for failure to state a claim.

## VII.    Failure to Serve

Hernandez's intended claims against Defendant Antoinette Ingram and the Doe Defendants additionally warrant dismissal under Rule 4(m) of the Federal Rules of Civil Procedure for failure to serve.

On October 18, 2024, the Court required Hernandez to show cause why the SAC should not be dismissed as to these Defendants for failure to timely serve under Rule 4. (Doc. 78.)   Hernandez then filed a "Motion to Show Cause for Additional Time to Serve Doe Defendants and Defendant Antoinette Ingram," seeking a sixty-day extension of time

---

[11]    The other intended Defendants are Mia Ingram and Jonelle Harris, whom the Court already dismissed because adding them as new Defendants exceeds the Court's grant of leave to amend, and unidentified "Chandler Officials" and "John/Jane Does."  (TAC at 47.)

to serve these Defendants.  (Doc. 80 at 5.)  Because the Individual Chandler Defendants' Motion to Dismiss was then pending, and it was possible the claims against the unserved Defendants would be dismissed, the Court granted Hernandez a 65-day extension of time after the Court ruled on the Motion to Dismiss to serve the unserved Defendants, "contingent upon the survival of any claims against Defendant [Antoinnette] Ingram and the Doe Defendants."  (Doc. 85 at 2.)

Even though no previously pending claims in the SAC survived the Court's grant of that Motion to Dismiss, because Hernandez asserted or reasserted claims against the unserved Defendants in the TAC, he was still required to serve those Defendants, and he has not shown he completed service on them, even though the original 65-day extension of time to do so—whether calculated from the date of the Court's ruling on the Motion to Dismiss or the date Hernandez filed the TAC—has elapsed.

Following the Court's entry of its December 5, 2025 show cause order regarding the unserved defendants, (Doc. 135), Hernandez agreed to dismiss thirteen of the unserved defendants, but he sought to maintain his claims against one deceased unserved defendant, Jonelle Harris, and he sought to extend the time to serve several additional unserved defendants: Mia Ingram, Antoinette Ingram, County of Maricopa, Arizona Department of Economic Security ("DES"), Sean Duggan, and Rosemary Rosales.  (Doc. 138.)  Since then, Hernandez has successfully served Maricopa County, rendering his motion moot as to that defendant.  (Doc. 140.)  The State responded to the extension request to oppose any extension of time to serve DES because it is a non-jural entity.  (Doc. 144.)  The Chandler Defendants replied to Hernandez's extension request, arguing that he failed to demonstrate good cause warranting an extension.  (Doc. 146.)

"The burden of establishing good cause under Fed. R. Civ. P 4(m) is on the plaintiff."  *Navarro v. United States*, 2024 WL 3498361, at *5 (D. Ariz. 2024) (citing *Boudette v. Barnette*, 923 F.2d 754, 755 (9th Cir. 1991)).  Hernandez has failed to show good cause.  He has provided no evidentiary support for his contention that he retained process servers to effect personal service on Mia Ingram and Antoinette Ingram or that

1   they have engaged in "potential avoidance of service." (Doc. 138 at 3–4). With respect to

2   DES, as the State notes, it is not a jural entity. Finally, Hernandez does not even attempt

3   to explain why he has not yet served Sean Duggan or Rosemary Rosales. Accordingly, the

4   Court will deny Hernandez's request.

5   **VIII.  Hernandez's Minor Children**

6           On December 8, 2025, the Court entered an order to show cause as to why

7   Hernandez's minor children should not be dismissed from this matter given that it appeared

8   that Hernandez lacked the capacity to bring suit on behalf of those children. (Doc. 137.)

9   Hernandez timely responded and requested that the Court either appoint a guardian ad litem

10  for his minor children or authorize him as a "next friend" to pursue claims on their behalf.

11  (Doc. 139.) The Chandler Defendants replied, arguing for dismissal of the minors without

12  prejudice under Rule 17(c). (Doc. 141; *see also* Doc. 143 (State's joinder in Chandler

13  Defendants' reply).)

14          Given that the Court will dismiss all claims and Defendants in this action, the Court

15  will deny Hernandez's request. Hernandez's minor children will be dismissed without

16  prejudice as parties to this action.

17  **IX.     Hernandez's Motion for Preliminary Injunction**

18          To obtain a preliminary injunction, the moving party must show "that he is likely to

19  succeed on the merits, that he is likely to suffer irreparable harm in the absence of

20  preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

21  the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The

22  moving party has the burden of proof on each element of the test. *Envt'l. Council of

23  Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

24          The Court lacks jurisdiction over claims for injunctive relief that are not related to

25  the claims pleaded in the operative complaint. *See Pac. Radiation Oncology, LLC v.

26  Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015) ("[w]hen a plaintiff seeks

27  injunctive relief based on claims not pled in the complaint, the court does not have the

28  authority to issue an injunction"); *see also Devose v. Herrington*, 42 F.3d 470, 471 (8th

1    Cir. 1994) (per curiam) (a party seeking injunctive relief must establish a relationship

2    between the claimed injury and the conduct asserted in the complaint).

3         In his Motion for Temporary Restraining Order and Preliminary Injunction,

4    Hernandez moves the Court to "stay enforcement of child support, custody, and property-

5    related orders issued in the Arizona state family court proceedings that are subject of

6    Plaintiff's pending claims under 42 U.S.C. § 1983." (Doc. 102 at 1−2.) Without

7    identifying any related claims in the SAC, Hernandez broadly states in his Moton that the

8    family court violated his Fourteenth Amendment rights through "[e]x parte orders,"

9    "[d]enial of discovery," "[l]ack of legal representation," and "[i]nvoluntary removal from

10   the family home without a fair hearing." (*Id.* at 2.)

11        This Motion fails for several reasons. First, Hernandez fails to state any claims

12   against any Defendants related to the family court orders he now seeks to stay or even to

13   allege any facts about these orders in the TAC to show they were improperly issued. By

14   moving for a stay of these orders, Hernandez therefore seeks relief as to "claims not pled

15   in the complaint" over which the Court lacks jurisdiction to issue an injunction. *Pac.*

16   *Radiation*, 810 F.3d at 636.

17        More fundamentally, even if Herandez could state a claim based on the family court

18   orders he seeks to stay, as the Court previously explained when denying a similar Motion

19   (*see* Doc. 61 at 18), federal courts are barred from ordering relief related to a plaintiff's

20   purported injuries from a state court judgment under both the *Rooker-Feldman* doctrine

21   and the Anti-Injunction Act, 28 U.S.C.A. § 2283. The *Rooker-Feldman* doctrine bars

22   subject matter jurisdiction where, as here, "a federal plaintiff asserts as a legal wrong an

23   allegedly erroneous decision by a state court[] and seeks relief from a state court judgment

24   based on that decision." *Noel v. Hall*, 341 F.3d 1148, 1156 (9th Cir.2003). Additionally,

25   under the Anti-Injunction Act, the Court "may not grant an injunction to stay proceedings

26   in a State court except as expressly authorized by Act of Congress, or where necessary in

27   aid of its jurisdiction, or to protect or effectuate its [own] judgments." 28 U.S.C.A. § 2283.

28   This mandate "extends not only to injunctions affecting pending proceedings, but also to

injunctions against the execution or enforcement of state judgments." *Henrichs v. Valley View Dev.*, 474 F.3d 609, 616 (9th Cir. 2007).  Put simply, "[a]n injunction may not be used to evade the dictates of the Act if the injunction effectively blocks a state court judgment." *Id.*  Based on these mandates, the Court will summarily deny Hernandez's Motion for Temporary Restraining Order and Preliminary Injunction.

## X.     Further Leave to Amend Will not be Permitted

Hernandez has now had three opportunities to amend his Complaint over the two-plus years of litigation since Defendants removed this case to federal court, and he appears unable to state a claim against any defendant despite specific instructions from the Court. Moreover, following the Court's last grant of leave to amend, Hernandez failed to comply with the Court's Order by attempting to add numerous new claims and defendants.  As shown above, Hernandez's attempted claims are largely frivolous, fail to satisfy basic pleading standards for stating a claim, and/or are legally insufficient in ways that cannot be cured through amendment.  Accordingly, the Court finds further opportunities to amend would be futile and will dismiss this action without leave to amend.  *See Moore*, 885 F.2d at 538 (repeated failure to cure deficiencies is one of the factors to be considered in deciding whether justice requires granting leave to amend).  "Leave to amend need not be given if a complaint, as amended, is subject to dismissal." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir. 1989).  The Court's discretion to deny leave to amend is particularly broad where a plaintiff has previously been permitted to amend his complaint. *Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996).

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendant State of Arizona's Motion to Dismiss Third Amended Complaint (Doc. 100), Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 102), Chandler Defendants' Motion to Dismiss Third Amended Complaint (Doc. 103), Defendant Lemonade Insurance Company's Motion to Dismiss (Doc. 116), Hernandez's request for an extension of time to serve certain defendants, (Doc. 138), and Hernandez's request that

1    the Court appoint a guardian ad litem to protect his minor children's interests or, in the

2    alternative, authorize him to pursue claims "as a next friend," (Doc. 139).

3        (2)    Defendants the Arizona Department of Economic Security, Lemonade

4    Insurance Company, Sean and Jane Doe Duggan, Geoffrey and Jane Doe Wrescher, Mario

5    and Jane Doe Urrutia, Mia and John Doe Ingram, and Jonelle and John Doe Harris, and

6    Plaintiff's claims in Counts 4, 5, 7, 8, 11, 14, 16, 17, 18, and 19 are **sua sponte dismissed**

7    without prejudice as exceeding the scope of the Court's limited leave to amend in Doc. 96;

8        (3)    The Clerk of Court is directed to **withdraw** Defendant Lemonade Insurance

9    Company's Motion to Dismiss at Doc. 113; Defendant Lemonade Insurance Company's

10    revised Motion to Dismiss at Doc. 116 is **denied as moot**.

11        (4)    Defendant State of Arizona's Motion to Dismiss Third Amended Complaint

12    (Doc. 100) is **granted**; the State is **dismissed** under Rule 12(b)(1) for lack of subject-matter

13    jurisdiction.

14        (5)    Chandler Defendants' Motion to Dismiss Third Amended Complaint

15    (Doc. 103) is **granted**, and all remaining claims are **dismissed** under Rule 12(b)(6) for

16    failure to state a claim.

17        (6)    Plaintiff's Motion for Temporary Restraining Order and Preliminary

18    Injunction (Doc. 102) and Plaintiff's request for appointment of a guardian ad litem for his

19    minor children, or to be authorized to pursue claims on their behalf as "next friend" (Doc.

20    139), are **denied**.

21        (7)    This action is **dismissed without leave to amend**; the Clerk of Court is

22    directed to enter judgment accordingly.

23        Dated this 7th day of January, 2026.

24

25

26                                Honorable Sharad H. Desai

27                                United States District Judge

28